Herman Tamingo, Appellant, v. Lena Freiberg et al., Appellees.

TRUSTS: Consideration Paid by Non-Title Holder.  One who holds
1  the legal title to land which has been paid for by another, holds
   as trustee of the latter, no gift being intended.

EVIDENCE: Allowable Conclusion.  Whether one received any-
2  thing for a conveyance is an allowable conclusion.

FRAUDS, STATUTE OF:  Paying Purchase Price and Taking Pos-
3  session.  An agreement under which one pays the purchase price
   of land and takes possession is not within the statute of frauds.

*Appeal from Floyd District Court.*—C. H. Kelley, Judge.

March 16, 1920.

Suit in partition of several lots in Charles City.  The defendant Lena Freiberg put in issue the title to Lot No. 3 in Block No. 87 of Kelly & Company's Addition to that city, and, on hearing, she was found owner thereof, and decree entered accordingly.  Plaintiff appeals.—*Affirmed.*

*H. L. Lockwood,* for appellant.

*H. J. Fitzgerald,* for appellees.

Ladd, J.—Henry Hinken died about March 5, 1917, without spouse or issue.  Title to Lots 6 and 7 in Block 88, and Lot 3 in Block 87, in Kelly & Company's Addition to St.

1. TRUSTS : con-
sideration paid
by non-title
holder.

Charles, now a part of Charles City, stood in his name.  Plaintiff is the only son of the sister of deceased, who had previously departed this life, as had her husband.  Among the defendants are Henry Hinken, Jr., and Lena Freiberg, children of deceased's brother, John Hinken, whose wife died when Henry and Lena were four and five years of age. The suit is for the partition of the lots.  Lena Freiberg, in her answer, asserted ownership of Lot 3, of Block 87, and

bases her claim on the following facts: Her grandfather, Yelshe H. Hinken, upon his death, left a will, which was duly admitted to probate, and in which he devised to his son John Hinken "a life estate in the following described real estate, situated in Floyd County, Iowa, to wit: The northeast quarter of the southeast quarter of Section No. fourteen (14), Township No. ninety-four (94), Range No. sixteen (16), West of 5th Principal Meridian, to have the use and occupancy of the same only during his life, with the remainder after his death to his two children, whose names are as follows: Henry Hinken aged sixteen years and Lena Hinken aged fifteen years."

When Lena was about four years of age, her mother died, and thereafter she and Henry lived with their uncle, Henry Hinken, until she was married. In 1905, decedent arranged to sell to Joseph and Lewis Hecht the land devised to Lena and Henry, together with another 40 acres, owned by himself, and, on the 27th day of May, 1905, Lena and her husband executed a conveyance to said Joseph and Lewis Hecht. The defendant Lena Freiberg pleaded that, as consideration therefor, her Uncle Henry promised to and did purchase her a home in Charles City, being Lot 3 in Block 87 aforesaid. It is undisputed that the decedent did, on the 17th day of November, 1905, purchase said lot of one Barber and wife, for a consideration of $1,000; that she, with her family, took possession, shortly after such purchase, and has continued in possession ever since. We think the evidence quite satisfactorily establishes the agreement set up by Mrs. Freiberg and its complete performance. Joseph Hecht testified that he purchased the land of decedent; that the price was $60 per-acre, or $1,200 for one half of the 40; that, when at Burr's office, signing the deed, decedent remarked that "he would make this right with Lena, and buy her a home," and further, that Burr asked Lena, "What are you getting out of this?" to which she made no response,

but decedent answered, "I make it right with her." Hecht's testimony was fully corroborated by Lena's husband, who, after saying that he took no part in the conversation in Burr's office, recited it substantially as did Hecht, and swore that Mrs. Freiberg received none of the money then paid. He testified further that he had heard a conversation between his wife and the decedent, in which he took no part, when decedent said that, "if she would give up and sign off there, he would buy her a home in Charles City;" that he had sold the land to Joe Hecht, and "she told him all right, she would do it." He also related that his wife and her uncle went to see the house, before he purchased it, when decedent told her he was going to buy it, if it suited her, to which she responded that "it suited her all right," and he then purchased the house, and remarked that it needed roof and painting, and that he would attend to that, and afterwards had the house painted. The witness further testified that, after decedent's wife died, Lena cared for him, and did his washing; that he furnished stone for the basement, and the witness hauled and put it in; that he heard decedent tell Lena that he was going to put in a sidewalk for her. Mrs. Freiberg was asked:

2. EVIDENCE: allowable conclusion.

"Tell the court what was said there between Judge Burr and your Uncle Henry Hinken. A. Well, Judge Burr asked uncle when I was going to get mine, and he said he would buy me a home, for signing off the quitclaim. Q. At that time, did you get anything for signing this deed? A. No, sir. Q. Did you ever receive anything until you got the home the following spring? A. No, sir."

Objection to this last question, "as calling for an opinion and conclusion of the witness," was not well taken; for it called for the negation of a fact, necessarily in the nature of a conclusion. She was asked:

"Now, do you know of your uncle buying a house and lot in the fall of 1905? A. Yes, sir. Q. Did you and your

husband go to look at this house and lot before he bought it? A. Yes, sir."

She then testified to moving into the premises purchased by decedent; that she had never paid any rent therefor; that decedent lived across the way from her home; that they visited back and forth; that her aunt died, June 2, 1906; and that he continued to live there alone. Objections to other questions were interposed under Section 4604 of the Code, though it is doubtful whether any of them went to the competency of the witness to testify. We shall so treat them; as the other evidence, with that referred to, sufficiently establishes the agreement pleaded, and its performance. Kramer swore that decedent said to him that he had bought a house "to give to Lena;" Burkholtz, that "he told him lots of times that Lena was doing lots of work for him, and it wasn't no more than right that he should take care of her;" Kuhnle, that he asked decedent "if Freiberg paid rent," to which decedent responded, "That belongs to Lena (referring to the house where Mrs. Freiberg lived). I bought that place for Lena," and that, "I would do more than that for her;" Craig, that, when he proposed to build a cistern on the premises, decedent remarked, "I gave Lena the house, and I think it no more than right for Albert [Lena's husband] go to work and build the cistern, for he ought to build one;" Otto, that decedent told him that "he had bought the house for Lena," and later referred to it, in talking with him, as Lena's place; Mrs. Otto, that Hinken said "he bought it for Lena Freiberg," but was going to keep the title while he lived, so that Albert couldn't use it. According to Arndt, a carpenter, decedent said that the house did not belong to him, but was Lena's house; that he bought it for Lena. According to Barks, decedent remarked that "he bought it for Lena, because she signed off in the other deed, and he wanted to procure for her, so she would have a home when he died;" and that, "if he gave it to her right

away, that Albert Freiberg might mortgage it or use it. He
said he would keep the legal title as long as he lived; that
he wanted to keep it; and, after he would leave them, it
would be hers." According to Smith, he said, pointing out
the place, "I bought that for Lena." According to Schuch-
necht, a week or two before his death, in speaking of his
houses, he remarked, "That other place is not mine; that be-
longs to Lena Freiberg." On the other hand, it was made to
appear that decedent paid taxes and kept up the insurance
on the house, and had repairs and improvements made. The
evidence that she cared for his home and did his washing
is undisputed. She had been reared by him from child-
hood, and what he did may well be attributed to his in-
terest in a dutiful niece, with a large family, not overbur-
dened with the things of this world. He may have said to
the insurance agent, as sworn by the latter, that he never re-
ceived any rent from Mrs. Freiberg; for she says the same.
The testimony of Kirsch, however, is entirely inconsistent
with that of other witnesses. He related that, three or four
weeks before his death, decedent informed him that "he was
going to sell everything and go to Europe, if the war was
over," and declared the house where Mrs. Freiberg lived be-
longed to him; that he ought to have sold it long ago; that
"the Freibergs never paid any rent, except one year that he
paid $60, but since then, he never paid anything," and did
not mention that the place belonged to Lena; that "the rea-
son he didn't collect the balance of the rent was that they
were so poor, he didn't get anything  *  *  *  had to pay
a good deal of expenses and taxes and everything at the
same time;" that Lena had done washing for him, but he had
paid her for it. The plaintiff claimed that Mrs. Freiberg
had told him, in substance, that decedent's wife collected
rent until her death,—about two months,—and related that
he found decedent in his house nearly frozen, shortly before
his death. Without discussing the credibility of these wit-

nesses, it is enough to say that the evidence overwhelmingly establishes the agreement as alleged by Mrs. Freiberg; that, in pursuance thereof, she and her husband executed the conveyance to the Hechts, and decedent purchased the property in controversy for her, and put her in possession thereof; and that she so continued for twelve years before this suit was begun. Having paid the purchase price, and taken possession in pursuance of the agreement, the statute of frauds furnished no obstacle to the proof. Sections 4625, 4626, of the Code; *Hughes v. Lindsey*, 31 Iowa 329; *Tuttle v. Becker*, 48 Iowa 486; *Kitchen v. Chantland*, 130 Iowa 618. Nor is it perceived on what theory it may be said that decedent held the legal title,

3. FRAUDS, STATUTE OF: paying purchase price and taking possession.

otherwise than as trustee for the use of Mrs. Freiberg. She paid the entire purchase price in advance, and, on that consideration, he gave her possession, but took title in his own name. Authorities are numerous holding that, in such a situation, a resulting trust arises in favor of the person paying the purchase price. *Culp v. Price*, 107 Iowa 133; *Copper v. Iowa Tr. & Sav. Bank*, 149 Iowa 336, 337. See *In re Estate of Mahin*, 161 Iowa 459. The decisions cited by appellant are not in point. The trust created was by operation of law, and not under Section 4625 of the Code. Nor is the question of tracing funds involved; for it clearly appears that, in consideration of the conveyance of Mrs. Freiberg's interest in the 40 acres of land, the decedent undertook to and did purchase the property in controversy for her, and, in fulfillment of his promise, gave her possession thereof. She continued in such possession under claim of right, and might have established her title or ownership by adverse possession, had she so pleaded. It is enough, however, that she received the realty in consideration of the conveyance alluded to, and decedent held the naked title in trust for her benefit. The decree is—*Affirmed.*

WEAVER, C. J., GAYNOR and STEVENS, JJ., concur.